1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **CENTRAL DISTRICT OF CALIFORNIA**
10

11 | TERRANCE BURNETT,                    ⎫   Case No. CV 09-1388 DMG (JWJx)
12 |                      Plaintiff,      ⎬   **FINDINGS OF FACT AND**
13 |            v.                        ⎬   **CONCLUSIONS OF LAW**
14 |                                      ⎬
15 | RAYTHEON COMPANY SHORT TERM          ⎬
16 | DISABILITY BASIC BENEFIT PLAN;       ⎬
   | RAYTHEON COMPANY DISABILITY          ⎬
17 | PLAN,                                ⎬
18 |                      Defendants.     ⎭

19

20        This matter is before the Court following a bench trial on the administrative record

21 on October 14, 2010.  Peter S. Sessions of Kantor & Kantor LLP appeared on behalf of

22 Plaintiff, Terrance Burnett.  Robert K. Renner of Barger & Wolen LLP appeared on behalf

23 of Defendants, Raytheon Company Short-Term Disability Plan and Raytheon Company

24 Long-Term Disability Plan.  After the parties filed supplemental briefs, the Court took the

25 matter under submission on October 28, 2010.

26        Having carefully reviewed the administrative record and the arguments of counsel,

27 as presented at the hearing and in their written submissions, the Court makes the following

28

                                      -1-

findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. <u>FINDINGS OF FACT</u>

1.     The Raytheon Company ("Raytheon") provides a short-term disability benefits plan ("STD Plan") and long-term disability benefits plan ("LTD Plan") for the benefit of its employees.  (Administrative Record ("A.R.") 1–87 [Doc. # 16].)

### <u>Pertinent Plan Terms</u>

2.     The STD Plan designates Metropolitan Life Insurance Company ("MetLife") as a Claims Administrator for the Plan:

>    2.5   **Claims Administrator** means the Metropolitan Life Insurance Company or other entity or individual designated by the Plan Administrator to administer claims filed under the Plan.

(A.R. 6.)

3.     The STD Plan vests MetLife, as the Claims Administrator, with discretionary authority to determine eligibility for benefits:

>    6.1   **Designation of Plan Administrator**.   The general administration of the Plan shall be the responsibility of the Company.  The Company shall be the Plan Administrator and named fiduciary for purposes of ERISA.  Benefits under this Plan will be paid only if the Claims Administrator decides it is in its discretion that the Participant is entitled to them.  All determinations of the Plan Administrator and Claims Administrator with respect to any matter within their discretion assigned responsibilities hereunder shall be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary and capricious.

6.2    **Discretion to Interpret Plan**.  The Plan Administrator and Claims Administrator, within their respective areas of authority, shall have absolute discretion to construe and interpret any and all provisions of the Plan . . . . The decisions of the Plan Administrator upon all matters within the scope of its authority shall be binding and conclusive upon all persons. With respect to all issues arising under claims for benefits and appeals with respect thereto, the Claims Administrator shall have full discretion and final authority to interpret the Plan, and its decisions as to claims shall be binding and conclusive upon all persons.

*                    *                    *

6.4    **Duties of Claims Administrator**.  Determination of all claims for Benefits and questions which may arise under the Plan with respect to the payment of Benefits shall be made by the Claims Administrator in accordance with the provisions of the Plan and consistent with the Claims Administrator's fiduciary obligations.  The Claims Administrator shall provide a full and fair review of any claim that is denied, in whole or in part.  All decisions regarding claims for Benefits under the Plan shall be based on objective evidence satisfactory to the Claims Administrator.  Benefits under this Plan will be paid only if the Claims Administrator decides in its sole discretion that the claimant is entitled to them.

*                    *                    *

(A.R. 14–16.)

4.    The Raytheon STD Plan defines "Full Disability" as follows:

-3-

2.11  **Full Disability** or **Fully Disabled** means that, due to an Injury or Sickness which is not covered by an applicable workers' compensation statute a Participant: (i) is under the regular care and attendance of a Doctor; and (ii) is unable to perform all of the essential elements of such Participant's regular job with reasonable accommodations.

(A.R. 7.)  Further, the STD Plan specifies the maximum duration of STD benefits:

2.13  **Maximum Benefit Duration** means . . . a ten (10) week period beginning on the date of the commencement of Benefits payable to a Participant.

(A.R. 7.)

5.     The Raytheon LTD Plan defines "Full Disability" as follows:

2.11  <u>Full Disability or Fully Disabled</u> means that, because of a sickness or injury which is not covered by an applicable workers' compensation statute, a Participant: (i) cannot perform the essential elements and substantially all of the duties of his or her job with the Employer even with a reasonable accommodation; and (ii) is under the care of a Doctor.

(A.R. 39.)

6.     The Raytheon LTD Plan provides for coordination of benefits with the STD Plan:

2.26  <u>Waiting Period</u> means with respect to each Period of Disability, the period for which a Participant is eligible for benefits under the Employer's short-term disability program. Participants must exhaust their short term disability benefits before Benefits become payable hereunder.

(A.R. 40.)

7.     The LTD Plan specifies the procedural requirements with which a Raytheon employee must comply to be eligible for LTD Benefits:

      8.1     <u>Claims Submission</u>.

      (A)     All claims for Benefits under the Plan, regardless of the nature of the claim, shall be submitted to the Claims Administrator in writing on a form provided by the Claims Administrator, or in any other manner designated by the Claims Administrator.

      *          *          *

      (F)     Failure by a Participant or beneficiary to follow the requirements of this ARTICLE shall result in the denial of the claim submitted.   The Participant or beneficiary submitting such deficient claim shall be deemed to have not exhausted his or her administrative remedies under the Plan.

(A.R. 52)

8.     The STD Plan and LTD Plan are both self-funded employee welfare benefit plans, meaning that Raytheon did not purchase an insurance policy from any insurer in order to satisfy the Plans' obligations to provide the respective types of disability benefits to eligible/entitled participants.[1]

## Burnett's Initial Claim For STD Benefits

9.     In February 2008, Plaintiff Terrance Burnett ("Burnett") was 52 years old and employed as a Senior Program Cost-Schedule & Control Analyst ("Program Cost Analyst") for Raytheon's Government and Defense Group.   At that time, Burnett had been employed by Raytheon for approximately 30 years.  (A.R. 204, 216.)

---

[1] The parties do not dispute that the STD Plan and LTD Plan are both self-funded employee welfare benefit plans.  (Pl.'s Resp. Trial Br. at 12; Defs.' Op. Br. at 14–15.)

10.    As an employee of Raytheon, Burnett was covered under the STD Plan and LTD Plan benefits.  (A.R. 89.)

11.    In the position of Program Cost Analyst, Burnett maintained a "high" level of independence.  (A.R. 241.)  His job required continuous computer use, shifting from one idea/process/task to another quickly, and complex and multiple mental tasks.  (A.R. 232.) Burnett referred to his assigned programs as "dynamic" and enjoyed keeping them on schedule and on budget.  (A.R. 240–41.)

12.    Burnett suffers from a psychiatric condition apparently caused by the painful breakup of his 23-year marriage in 2007.  (A.R. 240, 285.)

13.    Burnett's psychiatric condition worsened, which caused him to stop working after February 14, 2008.  (A.R. 216, 240–41.)

14.    Burnett subsequently submitted a STD benefits claim to MetLife.  On February 20, 2008, MetLife acknowledged Burnett's claim by a letter and sent him an authorization form to obtain the medical information and records it needed to make a claim determination.  (A.R. 243.)

15.    On February 20, 2008, Burnett visited his psychiatrist, Dr. Daniel Anderson. During the visit, Burnett stated that he was not feeling well and was engaging in minimal activity.  Dr. Anderson noted Mr. Burnett's marital difficulties, diagnosed him with major depressive episode, and increased his prescription for Lexapro, an antidepressant, from 15 milligrams to 20 milligrams.  (A.R. 251.)

16.    On February 21, 2008, MetLife spoke with Mr. Richard Santos, Burnett's supervisor at Raytheon.  Mr. Santos confirmed Burnett's job description and noted the following:  three weeks prior, Burnett had taken on additional job duties, which required him to travel once a week; Burnett's performance had increasingly worsened in the previous six to eight months; he had more absences from work than usual in the previous three to four months; and he had been dealing with personal issues in the previous six to eight months, which had "taken hold of him and affected his job performance."  (A.R. 240–41.)

17.   On February 23, 2008, MetLife spoke with Burnett's psychologist, Dr. Steven Friedman, who stated that Burnett was "a poster boy for major depression severe" and informed MetLife that Burnett was very suicidal, tearful, unable to focus or concentrate; had lost 25 pounds; and suffered from insomnia.  (A.R. 240.)

18.   On February 26, 2008, MetLife conducted an initial telephonic interview with Burnett, during which Burnett discussed his current symptoms.  Burnett told MetLife that, while he didn't want to come across as suicidal, if he "didn't wake up, it would be okay."  Burnett informed MetLife of his daily crying spells, trouble sleeping, significant weight loss in the previous year, impaired focus and concentration, difficulty being around people, and overwhelming depression and anxiety.  Burnett informed MetLife that his wife had left him a year prior and that he had previously sought treatment from Dr. Anderson and Dr. Freidman for depression.  Burnett explained that he had attended a divorce settlement meeting on February 1, which confirmed for him that his wife was not coming back and caused him to fall into a depressed state.  Burnett described feeling as though he was going to have a heart attack.  Burnett also noted that since leaving work, he felt worse because he felt that he was letting people down.  MetLife noted that Burnett was weeping and teary during the interview.  (A.R. 239–40.)

19.   On March 20, 2008, MetLife sent Burnett a letter, approving his claim for STD benefits from February 15 through March 13, 2008:

> According to the medical information, Dr. Anderson has confirmed your diagnosis and treatment for depression.  Based on your medical information we expected that you would have been able to return to work as of March 14, 2008, so your benefits were terminated and your claim was closed on that date unless we receive medical information supporting your continuing disability from your job.

(A.R. 320–22.)

20.    On March 24, 2008, Burnett contacted MetLife to express his disagreement with MetLife's determination to terminate his benefits as of March 14.  Burnett informed MetLife of his recent appointment with Dr. Anderson on March 19 and confirmed he would ask Drs. Anderson and Friedman to send MetLife updated medical information. (A.R. 236.)

21.    On April 1, 2008, MetLife received Dr. Anderson's progress notes from Burnett's March 19, 2008 appointment.  Dr. Anderson noted Burnett's self-report that he was "doing better."  Dr. Anderson noted Burnett's mood was dysphoric, but mildly improving.  Dr. Anderson continued to diagnose Burnett with major depressive episode and to prescribe 20 milligrams of Lexapro.  (A.R. 255.)

22.    On April 3, 2008, Wendy Washington, a Raytheon representative, informed MetLife that she spoke to Burnett, who told her that he was depressed and not ready to return to work.  (A.R. 235.)

23.    On April 7, 2008, MetLife issued a letter to supplement the March 20 letter and to confirm that Burnett was not eligible for STD benefits beyond March 13.  MetLife based its claim determination on the March 19 progress note from Dr. Anderson:

> We received a March 19, 2008 progress note from your treatment provider.  The updated documentation notes that you presented to your treatment provider with a report of doing better.  Your mood is noted to be improving and you stated that you are staying active.   Your previously reported passive suicidal ideation is noted in most recently received documentation to no longer be present.
>
> Based on our review of the information, the medical information does not support your inability to perform you job duties beyond March 13, 2008. . . . Therefore, under the terms

of the plan, your Short-Term Disability benefits were terminated effective March 14, 2008.

(A.R. 334–35.)

### **Burnett's Appeal Of MetLife's STD Benefits Termination Beyond March 13, 2008**

24. On April 9, 2008, Burnett appealed MetLife's STD benefits termination. Burnett informed MetLife that both Drs. Anderson and Friedman agreed that he could not return to work due to the severity of his depression. (A.R. 257.)

25. On April 15, 2008, MetLife sent Burnett a letter, acknowledging his appeal of the benefits termination. (A.R. 336.)

26. On April 17, 2008, Raytheon completed and provided MetLife with an "Employer's Statement of Job Demand" for Burnett's position. Raytheon described Burnett's job duties as a Program Cost Analyst as requiring him "to shift from one idea/process/task to another quickly" and complete "complex and multiple steps." (A.R. 337–38.)

27. On April 21, 2008, Dr. Friedman completed a supplemental certification form, confirming Burnett's ongoing diagnosis of major depression and estimating Burnett would be able to return to work on June 23, 2008. (A.R. 276.)

28. MetLife referred Burnett's file to Dr. Mark Schroeder, a board-certified psychiatrist, for an independent Physician Consultant Review. Dr. Schroeder completed his review on May 1, 2008. (A.R. 258–63.)

29. In connection with his review, Dr. Schroeder held a teleconference with Dr. Friedman on April 29, 2008, who confirmed that Burnett was functioning poorly since leaving work on February 14. Dr. Friedman also noted that Burnett looked morose and dysphoric with psychomotor retardation and constricted effect; had passive suicidal ideation; was not maintaining usual daily activities; and, considering Dr. Friedman's history with Burnett—having seen him as a patient a year prior—was not yet at his baseline. In terms of cognitive functioning, Dr. Friedman noted that Burnett showed

1    cognitive "slippage" with repetitive and preservative speech and could not expand on his
2    ideas.  (A.R. 258.)

3        30.    Dr. Schroeder also held a teleconference with Dr. Anderson on May 1, 2008.
4    Dr. Anderson noted that Burnett was not doing well and that he had increased Burnett's
5    antidepressant medication.   Dr. Schroeder asked Dr. Anderson why his February 20
6    progress notes described Burnett as, generally, doing better than Dr. Friedman's
7    description on February 23.   Dr. Anderson explained that he had not prepared the
8    February 20 progress notes with a disability evaluation in mind, and, further, it was
9    possible that Burnett's presentation on February 20 was different from his presentation on
10   February 23.  (A.R. 259.)

11       31.    Dr. Schroeder noted that on April 1, 2008, Burnett informed MetLife that he
12   was seeing Dr. Friedman almost weekly.   Dr. Schroeder also noted Ms. Washington's
13   April 3, 2008 communication with MetLife, informing MetLife that Burnett was
14   depressed and not ready to return to work.  (A.R. 261.)

15       32.    Dr. Schroeder concluded that the medical information did not support
16   psychiatric functional limitations beyond March 13, 2008.   In connection with his
17   conclusion, Dr. Schroeder first noted that Drs. Anderson and Friedman had both opined
18   that Burnett has been unable to work since February 14, 2008 because he suffered from
19   severe depression.  Dr. Schroeder further noted that Dr. Friedman's report, "taken at face
20   value," supported that Burnett suffered from significant psychiatric impairment beyond
21   March 13.  (A.R. 261–62.)   He claimed, however, that Dr. Anderson's report was
22   "significantly inconsistent" with that of Dr. Friedman, thereby raising questions about the
23   severity and persistence of Burnett's impairments, as described by Dr. Friedman.  (A.R.
24   262.)   Dr. Schroeder noted that while Dr. Anderson rendered a clinical opinion that
25   Burnett was not doing well, Dr. Anderson's evaluation did not show other significant
26   abnormality.   Dr. Schroeder summarized his conclusion, noting alleged inconsistencies
27   between Drs. Anderson and Friedman's descriptions of Burnett and that neither doctor
28   was able to corroborate Burnett's self-reported difficulties with "objective evidence."

-10-

1   (*Id.*)   Dr. Schroeder also noted that Burnett was regularly seeing Drs. Anderson and
2   Friedman and receiving appropriate treatment beyond March 13.  (*Id.*)

3        33.   On May 8, 2008, Dr. Friedman contacted MetLife to comment on Dr.
4   Schroeder's report.  Dr. Friedman criticized Dr. Schroeder's report for having relied on
5   Dr. Anderson's records over his own, especially because Dr. Anderson knows and sees
6   Burnett less than Dr. Friedman.  Dr. Friedman also explained that Dr. Anderson's positive
7   clinical notes from March 19 merely documented Burnett in a brief and partial remission
8   that was not sustained.  (A.R. 280, 294.)

9        34.   On May 13, 2008, Dr. Anderson contacted MetLife by telephone and
10  expressed dissatisfaction with the claims review process.  He also stated that he saw
11  Burnett only for 15-minute medication evaluations.  (A.R. 155, 294.)

12       35.   On May 13, 2008, Dr. Friedman sent a letter to Raytheon, noting that Burnett
13  was "temporarily totally disabled" as of that date and estimated he would return to work
14  by June 23, 2008.  (A.R. 279.)

15       36.   On May 13, 2008, Rieko Yoneda, a Raytheon Nurse Practitioner, evaluated
16  Burnett.  Ms. Yoneda noted in her report that Burnett sat nervously in the waiting area and
17  was trembling and crying.  Ms. Yoneda also noted that while taking Burnett's blood
18  pressure, his whole body tensed, and his hands were shaking.  Ms. Yoneda noted
19  Burnett's self-reported irregular sleep patterns, weight loss, and prescription medication,
20  and Burnett's comment that he was "[f]ighting with ideas to end [his] life."  (A.R. 349)
21  Ms. Yoneda evaluated Burnett using the "Beck inventory" depression evaluation tool.
22  Burnett scored a 32, which correlates with severe depression.  Ms. Yoneda concluded that
23  Burnett "is unable to perform normal job [duties] with his conditions at this time" and
24  would need "further evaluation and treatment" before being able to return to work.  (A.R.
25  349–50.)

26       37.   On May 20, 2008, MetLife denied Burnett's appeal and upheld its initial
27  decision to terminate Burnett's STD benefits as of March 13.  MetLife first summarized
28  the details of Burnett's claim and explained its initial denial decision.  MetLife then

-11-

summarized the additional information Burnett provided in connection with the appeal and concluded:

> Based on a review of this information, we have determined that the clinical information does not support a lack of functionality due to a psychiatric or physical disorder as of March 14, 2008. There is no information on file supporting any ill or untoward effects from your psychotrophic medications and we continue to lack significant objective data which would preclude your ability to work.  The information provided includes self-reported symptoms, and we have not been provided with mental status examinations noting any significant or severe psychopathology.   The information did not support a psychiatric acuity, severity or debility to the extent that it would preclude work beyond March 14, 2008.

> In summary, the clinical data does not support the existence of a condition that would render you totally disabled and unable to perform your normal occupation beyond March 13, 2008.  We are lacking the objective findings during your examinations that would support your inability to perform your normal occupation.  Therefore, we must uphold our previous decision to disallow your claim for Short Term Disability benefits beyond March 13, 2008.

(A.R. 351–55.)

**Burnett's Additional Evidence And Request That MetLife Reconsider Its Decision**

38.     On May 13, 2008, Tina Romaine, FNP, Raytheon's Disability Coordinator, noted that Burnett wakes up with cold sweats in the middle of the night, reported weight loss from 174 to 145 pounds, and was fighting suicidal thoughts with a vague idea of

making his death look like it resulted from natural causes.  Ms. Romaine also observed that Burnett sat nervously in the waiting room, appeared trembling and crying, and had poor eye contact.  Ms. Romaine diagnosed major depressive disorder, and opined that Burnett was not able to perform his normal job duties.  (A.R. 294–95.)

39.   On June 11, 2008, at Raytheon's request, psychologist Dr. Kevin Flynn examined Burnett for clinical evaluation.  Dr. Flynn conducted a clinical interview and also utilized the Minnesota Multiphasic Personality Inventory 2 (MMPI-2).  Dr. Flynn noted the rationale for such a psychological test:

> Psychological tests are useful tools to corroborate and augment information obtained from other sources.  As such, tests function as objective assessment of subjective complaints, help in clarifying the nature of the subjective complaints and may facilitate distinctions which have significance for disability evaluation and diagnosis.  Psychological tests are designed to measure the degree of impairment against some objective standard.  Psychological tests are helpful tools in measuring a person's psychological disturbances across time, i.e. signifying improvement or deterioration of a condition over time.

(A.R. 287–88.)

40.   With respect to the MMPI-2 results, Dr. Flynn noted:

> Mr. Burnett['s test results] were reviewed with particular attention focused on measures of suicidal ideation, acting out, aggression, impulse control, depression, anxiety, mania, antisocial behavior, thought disorder, and delusional/schizophrenic processes.

(A.R. 288.)  Dr. Flynn further noted that, during the clinical interview, Burnett appeared anxious and depressed, was crying throughout the interview, and was noticeably shaking.  Dr. Flynn summarily described the MMPI-2 results as constituting evidence of significant

elevations in scales of depression, anxiety, hysteria, and hypochondriasis. Dr. Flynn noted that Burnett was clearly emotionally distraught and had admitted past suicidal ideation. Dr. Flynn opined that his psychological testing was consistent with Burnett's self-reports and Dr. Friedman's observations. Dr. Flynn concluded that, based on the results of his clinical assessment, Burnett was a significantly distressed individual at that time, whose coping should improve with intense psychotherapeutic and psychiatric treatment. Dr. Flynn opined that Burnett's then-present psychological functioning indicated a strong need for continued mental health treatment and medication and that he needed to stabilize his emotional process before he would be capable of returning to work. (A.R. 287–88.)

41.     On June 18, 2008, Dr. Sandra Stratford, Raytheon's Chief Medical Officer, provided MetLife with Dr. Flynn's report. Dr. Stratford summarized Dr. Flynn's findings and confirmed that she reviewed the report and discussed the findings with Dr. Flynn. Dr. Stratford noted that it was her clinical opinion that Dr. Flynn's report supported Burnett's medical leave and requested that MetLife review Dr. Flynn's report in reconsidering Burnett's claim. (A.R. 286.)

42.     On June 24, 2008, Dr. Schroeder completed a supplemental Physician Consultant Review to serve as an addendum to the May 1 report. (A.R. 293–97.) Dr. Schroeder noted that Burnett's diagnosis was "major depressive disorder, recurrent, severe." (A.R. 293.) Dr. Schroeder summarized the additional information provided to him, including reports from Drs. Anderson and Friedman, Ms. Romaine, Dr. Flynn, and Dr. Stratford. Dr. Schroeder concluded that the additional information supported Burnett's psychiatric impairment beginning May 13 and likely to continue through July 12, 2008. Dr. Schroeder also concluded:

> Although it is possible that this impairment had been present before 5/13/08, the records of Dr. Friedman and Dr. Anderson did not provide sufficiently detailed, specific, consistent, and objective mental health information to establish the presence of impairment during that time.

1  (A.R. 296.)

2         43.    On July 1, 2008, Dr. Friedman completed a supplemental certification,

3  confirming Burnett's continuing diagnosis of major depression.  Dr. Friedman described

4  Burnett's symptoms of lethargy, dysphoria, and minimal concentration.  Dr. Friedman

5  estimated that Burnett could possibly return to work on August 18.  (A.R. 300.)

6         44.    On July 2, MetLife informed Burnett that it reviewed the additional evidence,

7  but it nonetheless was upholding its initial decision to terminate his STD benefits after

8  March 13:

9                 [The new] information was forwarded to Dr. Mark Schroeder.

10                . . . We asked Dr. Schroeder to review these new findings and

11                provide his assessment whether this new information supported

12                your continued inability to perform the essential elements of

13                your job as of the March 14, 2008 termination date.   Dr.

14                Schroeder agreed that although this new information supported

15                functional limitations as of May 14, 2008, we continue to lack

16                evidence or a severity in your global functional impairment

17                which would have precluded you from performing the essential

18                elements of your job as of March 14, 2008 the date your

19                benefits were terminated.

20

21                A thorough and fair review of your claim for disability benefits

22                was completed, and we feel that our decision to uphold the

23                decision to terminate benefits as of March 14, 2008 was

24                reasonable.   Therefore, our review does not change our

25                previous opinion as outlined in our letter dated May 20, 2008.

26                As you were not continuously disabled from March 14, 2008 to

27                May 13, 2008, no benefits are payable.

28  (A.R. 356–57.)

1

**Burnett's Claim For LTD Benefits**

2       45.       Burnett never submitted an LTD benefits claim to MetLife.[2]

3

4              **II.  CONCLUSIONS OF LAW**

5       1.       Burnett's STD and LTD benefits claims are governed by the Employee

6   Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

7       2.       This Court has subject matter jurisdiction pursuant to ERISA, 29 U.S.C.

8   § 1132(a), and 28 U.S.C. § 1331.

9              **Standard Of Review**

10      3.       A district court reviews an administrator's denial of benefits *de novo* "unless

11  the benefit plan gives the administrator or fiduciary discretionary authority to determine

12  eligibility for benefits."  *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522

13  F.3d 863, 866 (9th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

14  115 (1989)).  If the benefit plan does grant the administrator discretionary authority, then

15  the district court reviews the administrator's decision for an abuse of discretion.  *Id.*

16      4.       In determining whether the administrator abused its discretion, the district

17  court asks whether it is "left with a definite and firm conviction that a mistake has been

18  committed."  *Salomaa v. Honda Long Term Disability Plan*, __ F.3d __, 2011 WL

19  768070, at *8 (9th Cir. Mar. 7, 2011) (internal quotation marks omitted) (quoting *United

20  States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).   The "administrator's

21  interpretation of the plan 'will not be disturbed if reasonable.'"  *Id.* at *7 (quoting

22  *Conkright v. Frommert*, __ U.S. __, __, 130 S.Ct. 1640, 1644, 176 L.Ed.2d 469 (2010)).

23  Reasonableness does not mean that the reviewing court would make the same decision—

24  the district court may not merely substitute its own view for that of the administrator—but

25  rather the district court "must consider whether application of a correct legal standard was

26

27      [2] The parties do not dispute that Burnett never submitted a claim for LTD benefits.  (Pl.'s Resp.

28  Trial Br. at 12; Defs.' Op. Br. at 12.)

-16-

1   (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from
2   the facts of the record." *Id.* at *8 (internal citations quotation marks omitted).

3        5.     "The manner in which a reviewing court applies the abuse of discretion
4   standard, however, depends on whether the administrator has a conflicting interest."
5   *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009).  If the
6   administrator is operating under a conflict of interest, that conflict will be weighed as one
7   factor in the abuse of discretion determination, but it does not change the standard of
8   review.  *Firestone Tire*, 489 U.S. at 115.  In this regard, the abuse of discretion review
9   must be "informed by the nature, extent and effect on the decision-making process of any
10  conflict of interest that may appear in the record." *Abatie v. Alta Health & Life Ins. Co.*,
11  458 F.3d 955, 967 (9th Cir. 2006).  "This standard applies to the kind of inherent conflict
12  that exists when a plan administrator both administers the plan and funds it, as well as
13  other forms of conflict." *Id.*

14       6.     Where there is no apparent conflict, "judicial review of a plan administrator's
15  benefits determination involves a straightforward application of the abuse of discretion
16  standard." *Abatie*, 458 F. 3d. at 967.  Because the abuse of discretion standard is
17  inherently flexible, a "straightforward analysis allows a court to review all the
18  circumstances before it" and adjust for those circumstances. *Id.*

19       7.     Factors the district court may consider in determining the amount of
20  deference to which the administrator is entitled include whether the administrator (1)
21  ignored plaintiff's self-reports that are inherently subjective and not easily determined by
22  objective measurement; (2) had a meaningful dialogue with the plaintiff in deciding
23  whether to approve the benefits claim; or (3) took plaintiff's doctors' statements out of
24  context, or otherwise distorted them." *Saffon*, 522 F.3d at 872–73.  The existence of such
25  factors allows the court to accord less deference to the claims administrator's decision. *Id.*
26  at 873.
27  //
28  //

-17-

**Abuse Of Discretion Standard of Review Applies**

8.     The plain language of the STD Plan unambiguously vests MetLife with discretionary authority to determine eligibility for benefits.  Therefore, the Court applies the abuse of discretion standard in reviewing MetLife's termination of Burnett's STD benefits beyond March 13, 2008.

9.     The STD Plan and LTD Plan are self-funded by Raytheon, and therefore MetLife does not operate under an inherent conflict of interest in determining eligibility for benefits.

10.     Although no structural conflict of interest exists, MetLife does maintain a contract with Raytheon to provide claim administration services under Raytheon's disability benefit plans.  Thus, MetLife has an incentive to maintain that contract by keeping the cost of Raytheon's disability benefit program low.  This is but one factor the Court weighs in determining whether MetLife abused its discretion in terminating Burnett's STD benefits beyond March 13.  *See Abatie*, 458 F. 3d. at 967 (noting that the Court's abuse of discretion review is to be informed by the nature, extent, and effect on the decision-making process of any conflicts of interest).

**MetLife's Termination of Burnett's STD Benefits Beyond March 13**
**Was An Abuse of Discretion**

11.     The Court's review of MetLife's decision is limited to the administrative record.  *Montour*, 588 F.3d at 632.  The Court considered the administrative record as a whole in determining whether MetLife abused its discretion in finding that Burnett was not totally disabled from March 14 through May 13, 2008, including but not limited to the following:  Dr. Anderson's notes and comments from February 20, March 19, and May 1, 2008; Dr. Friedman's notes and comments from February 23, April 21, May 1, May 8, and July 1, 2008; Ms. Yoneda's May 13, 2008 report; Ms. Romaine's May 13, 2008 report; Dr. Flynn's June 11, 2008 report; Dr. Stratford's June 18, 2008 report; Dr. Schroeder's May 1 and June 24, 2008 reports; and Burnett's ongoing self-reports from February 20 through July 1, 2008.  Considering the foregoing, the Court finds that the

administrative record reflects overwhelming evidence that Burnett was continuously and fully disabled from February 15 through June 2008. MetLife's termination of Burnett's benefits beyond March 13, 2008, was unreasonable—i.e., it was illogical, implausible, and without support in inferences that may be drawn from the facts in the administrative record—and, therefore, it was an abuse of discretion.

12. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Supreme Court declined to apply the "treating physician rule" to ERISA-covered plans and held that administrators of such plans are not required to accord special weight to the opinions of a disability claimant's treating physician. Nevertheless, plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. Here, Dr. Schroeder rejected Dr. Friedman's opinion that Burnett was totally disabled, as well as other evidence in the record corroborating that opinion. Dr. Schroeder claimed that there was a dearth of detailed "objective" information and relied upon isolated comments in Dr. Anderson's February 20 and March 19, 2008 progress reports, including one on March 19 indicating that Burnett had self-reported he was "doing better" that day. In so doing, Dr. Schroeder arbitrarily discounted the opinion of Dr. Friedman, the treating physician whom Burnett saw weekly, and distorted the importance of the progress reports submitted by Dr. Anderson, whom Burnett saw with less frequency. In fact, Dr. Anderson did not disagree with Dr. Friedman's opinion at all. In later criticism of MetLife's claims review process, Dr. Anderson pointed out that he saw Burnett only in 15-minute intervals periodically to administer his depression medication and did not purport to offer a disability evaluation in his progress reports. In the February 20 report, Dr. Anderson diagnosed Burnett with "major depressive episode" and increased his depression medication. Likewise, in his March 19 report, Dr. Anderson maintained his diagnosis of "major depressive episode" and continued the Lexapro prescription for Burnett. As such, MetLife and Dr. Schroeder failed to reconcile Burnett's isolated March 19 self-report of "doing better" with Dr.

Anderson's continuing diagnosis and prescription of depression medication and his opinion that Burnet was disabled from returning to work.

13.     In evaluating the administrative record, the Court also considers the unique nature of psychiatric disabilities, which often involve subjective complaints.  For example, in using the MMPI-2 test to diagnose Burnett with Major Depression and Anxiety, Dr. Flynn examined Burnett with particular attention focused on symptoms of suicidal ideation, depression, anxiety, mania, and thought disorder, among other symptoms.  (A.R. 288.)  Each of these symptoms can be highly subjective.

14.     Given the nature of clinical depression, Dr. Schroeder overemphasized the significance of Dr. Anderson's February 20 and March 19 progress reports to the exclusion of the overwhelming weight of the evidence in the record, including the characteristics of the job that Burnett previously occupied and the corroborating results of the MMPI-2.  Burnett could report "doing better" on March 19 and still be in a sufficiently depressed mental state  as to be unable to perform the essential elements of his job even with reasonable accommodations—as Burnett and a host of other medical professionals asserted was in fact the case both before and after March 13, 2008.  There is ample objective and subjective evidence in the record supporting Burnett's claim of continuous and total disability before and after March 13.  For MetLife and Dr. Schroeder to conclude otherwise was an abuse of discretion.

15.     Dr. Schroeder's finding that Dr. Friedman's reports were significantly "inconsistent" with Dr. Anderson's report was also unreasonable.  The Court does not find significant inconsistencies between Dr. Anderson's February 20 and March 19 reports and Dr. Friedman's February 23 report.  Rather, both doctors opined that Burnett was unable to work as of February 14 because of severe depression.  Specifically, Dr. Anderson's March 19 progress notes—in which he noted that Burnett said he was "doing better"— were not inconsistent with Dr. Friedman's report:   Dr. Anderson clarified the March 19 progress notes on May 1, when he told Dr. Schroeder that Burnett was not doing well and was still on the same medication; and Dr. Friedman explained the March 19 progress

notes on May 8, when he told Dr. Schroeder that the March 19 positive clinical notes merely documented Burnett's partial remission, which was not sustained.

### Burnett Is Entitled To STD Benefits For The Maximum 10-Week Period

16.    Burnett is entitled to STD benefits for the maximum 10-week period—from February 15 through April 25—because the evidence clearly shows that Burnett qualified as fully disabled during that time period.  The above-referenced medical records from Drs. Anderson and Friedman, Ms. Yoneda, Ms. Romaine, Dr. Flynn, and Dr. Stratford unequivocally support a finding that Burnett was both (1) under the regular care and attendance of Drs. Anderson and Friedman and (2) unable to perform all of the essential elements of the position of Program Cost Analyst—which required a high level of independence; complex and multiple mental tasks; shifting from one idea/process/task to another quickly; and planning and organizing his own activities—even with reasonable accommodations for the 10-week period.

### Burnett Is Not Required To Exhaust His Administrative Remedies
### Under the LTD Plan Because Exhaustion Would Have Been Futile

17.    The general exhaustion rule covering ERISA claims requires a claimant to "avail himself or herself of a plan's own internal review procedures before bringing suit in federal court."  *Diaz v. United Agr. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995) (citing *Amato v. Bernard*, 618 F.2d 559, 566–68 (9th Cir. 1980)).  The general rule of exhaustion, however, is not a statutory requirement, and a court "may waive the exhaustion requirement, and should do so when exhaustion would be futile."  *Horan v. Kaiser Steel Ret. Plan*, 947 F.2d 1412, 1416 (9th Cir. 1991) (citing *Amato*, 618 F.2d at 568).

18.    The Court finds that, under the facts of this case, Burnett's exhaustion of the LTD administrative remedies would have been futile for the following reasons.  First, the definitions for "fully disabled" for purposes of STD benefits and LTD benefits are substantially the same.  (A.R. 7, 39.)  Second, the STD and LTD plans are integrated, such that they rely on and refer to each other.  (A.R. 40.)  MetLife's termination of Burnett's

STD Plan benefits essentially doomed any claim he might have to LTD Plan benefits. Finally, because MetLife is the designated Claim Administrator under both the STD and LTD plans (A.R. 6, 38.), the plans are administered by the same entity.  In light of the foregoing—considered together with MetLife's unwavering denial of Burnett's post-March 13 STD benefits—MetLife likely would have denied any LTD benefits claim Burnett submitted for the same reasons it terminated his STD benefits claim.

19.    Finally, the Court considers the policy implications of the exhaustion doctrine, which include "the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlements and a proper reliance on administrative expertise." *Diaz*, 50 F.3d at 1483.  None of these policy considerations preclude the Court from applying the futility exception to the facts of this case.  To require Burnett to submit a written claim for LTD benefits—which would be subject to a denial similar to that of his STD benefits claim—only then to require him to exhaust his administrative appeals and then possibly return to this Court, would exalt form over substance and defeat the fair and efficient administration of justice.

## Burnett Is Entitled To LTD Benefits, And The Court Remands The LTD Benefits Claim To MetLife To Decide The Amount And Duration Of Such Benefits

20.    The Court finds the administrative record contains overwhelming evidence that Burnett was fully disabled within the meaning of the LTD Plan, and therefore qualified for LTD benefits, from at least April 26 through July 1, 2008 because the aforementioned facts show (1) Burnett could not perform the essential elements and substantially all of his duties as a Program Cost Analyst, notwithstanding reasonable accommodation, and (2) he was under the care of a Drs. Anderson and Friedman during that time period.   The administrative record is insufficient, however, to determine Burnett's eligibility for LTD benefits beyond July 1.  As such, the Court remands the issue of the amount and duration of Burnett's LTD Benefits after July 1, 2008 to MetLife.

//

1      **Any of the above Findings of Fact which are more appropriately deemed a**
2   **Conclusion of Law or vice versa are so deemed.**

3

4                                    **III.  <u>CONCLUSION</u>**

5          1.      MetLife abused its discretion in terminating Burnett's STD benefits beyond
6   March 13, 2008.

7          2.      Burnett is entitled to STD benefits for the maximum 10-week period, from
8   February 15 through April 25, 2008.

9          3.      Burnett was not required to submit a claim for LTD benefits, thereby
10  exhausting his administrative remedies under the LTD Plan, because such exhaustion
11  would have been futile.

12         4.      The administrative record shows that Burnett is entitled to LTD benefits,
13  from at least April 26 through July 1, 2008, but the record is insufficient to determine
14  Burnett's eligibility for LTD benefits beyond July 1, 2008.

15         5.      Burnett is entitled to prejudgment interest.  *See Blanton v. Anzalone*, 760
16  F.2d 989, 992-93 (9th Cir. 1985).

17         6.      The Court remands the case to Met Life for handling consistent with these
18  Findings of Fact and Conclusions of Law.

19         7.      Burnett is the prevailing party and may bring a motion pursuant to 29 U.S.C.
20  § 1132(g) within 30 days from the date of these Findings of Fact and Conclusions of Law.

21

22  DATED:      April 14, 2011

23

24                                     _____
                                          DOLLY M. GEE
25                                     UNITED STATES DISTRICT JUDGE

26

27

28

-23-